REGIONAL REDEVELOPMENT COR-PORATION, et al.,
Appellants/Cross–Appellees,

v.

John R. HOKE,
Appellee/Cross–Appellant.

Nos. 86–1173, 86–1255 and 87–147.

District of Columbia Court of Appeals.

Argued Feb. 2, 1988.
Decided Sept. 29, 1988.

---

Leonard R. Goldstein, College Park, Md., for appellants/cross-appellees.

James R. Michal, Washington, D.C., for appellee/cross-appellant.

Before MACK, ROGERS and STEADMAN, Associate Judges.

STEADMAN, Associate Judge:

This case involves a dispute over a real estate brokerage commission in which the plaintiff broker, Hoke, doubled as an expert witness. The jury awarded Hoke a commission of $60,000, six percent of the sale price of $1 million. Appellants are the defendants Regional Redevelopment Corporation and Sidney J. Brown (whom we shall refer to collectively as "Regional").

The main issue on appeal is whether the trial court erred in allowing Hoke to testify as an expert when he had not been listed as such in pretrial documents. We hold that the trial court did not abuse its discretion in finding that Regional was not unfairly surprised or prejudiced by this testimony and in allowing it in for that reason. We also find no grounds for reversal in Regional's other assertions of error, nor in Hoke's cross-appeal of the court's denial of prejudgment interest. Accordingly, we affirm.

I.

The salient facts (which were in sharp dispute) in the light most favorable to Hoke are as follows. Morgan, the president of Regional, which had taken legal title to the property in question on behalf of Brown, told Hoke that the property was for sale.

When this occurred, Hoke was in the suite of offices shared by Morgan and Brown to discuss the sale of another property, the Tower Building in Baltimore, which he was already under contract to sell. Hoke testified that at that time Morgan asked him to find a buyer for the property at issue in this case, the Brentwood Village Shopping Center in the District of Columbia. Morgan then gave Hoke a brochure prepared by Regional for the sale of the shopping center. Hoke treated this brochure, which contained a broad range of information about the property, to be the owner's written consent to Hoke's offering the property for sale as required under D.C.Code § 45–1908(14) (1981) (current version at D.C.Code § 45–1936(15) (1986 repl.)). Shortly thereafter, Hoke advertised the property in the Washington Post. On March 8, 1982 Jawer responded to the ad, and within the next few days he visited the property. Hoke testified that after receiving a suggested offer from Jawer, he delivered to him a counter-offer from Regional and additional lease information. Hoke also testified that he did not hear from Jawer after delivering the counter-offer and lease information to him, even though he called and left messages for him several times. Unbeknownst to Hoke, within the next two weeks, Jawer, his business partner Fabrizio, and a man named Fernebok discussed a joint purchase of the property.[1] When they met with Brown to negotiate this possibility, Jawer mentioned Hoke's name and told Brown he had already seen the property and the brochure. On March 25, 1982 Jawer wrote to Brown to memorialize an understanding they had reached regarding an option to purchase. This agreement culminated in the sale of the shopping center to a partnership made up of these three individuals and a financial investor.[2]

## II.

Hoke conceded at trial that there was no explicit agreement, either oral or written,

as to what the commission would be on this particular sale. He therefore proposed to testify as an expert in the field of real estate brokerage practices that six percent was the usual and customary commission for commercial real estate transactions during the relevant period. However, during pretrial, Regional had asked in an interrogatory: "Please identify all expert witnesses whom you propose to call at trial ..." and Hoke answered "No expert has been retained as of this date." Nor was Hoke listed as an expert in his pretrial statement. After a bench conference, the court nevertheless allowed Hoke to be qualified as an expert, and to present this testimony. Regional claims that in so doing, the court misapplied our holding in *Adkins v. Morton*, 494 A.2d 652 (D.C.1985).

 Even assuming that in response to the interrogatory or in the pretrial statement, Hoke was under some obligation to notify Regional that he would testify as an expert, in affirming we rely on what we read as the trial court's alternative reason for allowing the expert testimony: Regional could not legitimately claim it was unfairly surprised or prejudiced by it. The prevention of unfair surprise at trial is one of the fundamental policies underlying the discovery rules. *Adkins v. Morton, supra,* 494 A.2d at 660. Whether or not an expert who is not listed in an interrogatory can testify is within the wide discretion of the trial court. *Corley v. BP Oil Corp.*, 402 A.2d 1258, 1261–62 (D.C.1979) (citing 8 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2050 at 326 (1970)); *Washington Hospital Center v. Cheeks*, 129 U.S. App.D.C. 339, 340, 394 F.2d 964, 965 (1968) (decision to allow unlisted expert witness to testify sustained; "District Judge must, of course, have broad discretion since he is in a far better position to evaluate the situation than are we," per Burger, J.); *see also* 8 C. WRIGHT & A. MILLER § 2030 at 252; 4 J. MOORE, J. LUCAS & G. GROTHEER, MOORE'S

---

1. Regional's defense rested on the claim that these negotiations were initiated by Fernebok, who independently learned of the property, after Jawer had told Hoke that for financial reasons he was not interested in the purchase.

2. Jawer owned a 15% interest in the partnership, as did the other two individuals.

FEDERAL PRACTICE ¶ 26.66[3] at 26–414 (1987). In our recent case of *Bell v. Jones*, 523 A.2d 982 (D.C.1986, as amended April 14, 1987), Jones, who had been testifying as an ordinary witness, wanted to testify as an expert. We found no abuse of discretion in disallowing the testimony, since Bell would have been prejudiced by the surprise testimony. *Id.* at 990. Here, by contrast, the judge specifically noted that such considerations were not present:

> [L]et's keep this in perspective. When we talk about surprise and prejudice, what we're talking about is the plaintiff who sued for a six percent commission testifying as to what the—if he is qualified. He's not qualified yet, based on his qualifications as a broker for 35 years or so, as to what the standard commission is in cases of this kind. It seems to me that it's very difficult for you to say that you are surprised or prejudiced by opinion testimony coming from Mr. Hoke if he was qualified as to six percent in this case. I mean you've known all along that's what this case was all about.

and later, in explaining his decision to let the testimony in, he found:

> [T]here really can't, it seems to me, be a legitimate claim of surprise in this situation.

Hoke was listed as a potential trial witness in his pretrial statement, and as a person "having personal knowledge of facts relevant to the litigation," *see* Rule 26(b)(1), in interrogatory responses. He stated in two different places in his pretrial statement that his claim for a six percent commission was based on the usual and customary commission. It would seem unreasonable for Regional to have assumed Hoke would attempt to present his case either without expert testimony or, as Regional suggests in its brief, solely by using Regional's own experts. Furthermore, this is not a situation where Regional did not have its own expert to counter Hoke; Morgan himself testified as an expert that in 1982 commercial real estate brokerage commissions were generally between three and six per-

cent. In addition, Brown testified, though not as an expert, that he would have expected to pay three percent on this sale. Finally, Jawer testified in response to questioning by Regional's attorney that commissions could range from less than one percent to six percent. We find no abuse of discretion in allowing the expert testimony in this case.[3]

We do not mean to suggest that prejudice vel non is necessarily decisive in determining sanctions for discovery violations. To begin with, the presence or absence of prejudice, and the degree thereof, may be of greater or lesser clarity. Furthermore, such factors as bad faith or willfulness, the nature of the evidence involved, and disruption of the orderliness of the trial may, for example, be relevant. *See, e.g., Murphy v. Magnolia Electric Power Ass'n*, 639 F.2d 232, 234–35 (5th Cir.1981); *DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1201–02 (3d Cir.1978). We perceive no such factors in the record here mandating exclusion. To the contrary, Hoke's response to the interrogatory stated that no expert "has been retained," not that Hoke did not intend to present expert testimony at all. Correct or not, Hoke argued to the trial court that he firmly believed he was excluded from the Rule 26(b)(4) response under the logic of *Adkins, supra*. Moreover, the expert testimony at issue was a key part of Hoke's case, and its admission cannot be seen to have affected the orderly flow of the trial.

Regional also claims error in the differing treatment of its own expert, Morgan. It asserts specifically that Hoke gave his expert opinion regarding this particular transaction while Morgan was not allowed to do the same, and that the jury did not receive the same instructions regarding the two experts. We disagree. Hoke testified about customary commissions in 1981 and 1982, and said they were six percent. Morgan was asked a very similar question, and testified that commissions ranged between three and six percent. Neither party testi-

---

3. "Presumably a court will not permit an expert witness to testify if [a Rule 26(b)(4) interrogatory] has been answered and that expert has not been named, but the matter is within the discretion of the court." 8 C. WRIGHT & A. MILLER, *supra* § 2030 at 252.

**1010**

fied as experts about their opinions of this particular transaction. As for jury instructions, the trial court explicitly applied the same one to Morgan as it had earlier given regarding Hoke. Moreover, before deliberations the court evenhandedly instructed "there has been a conflict in the testimony of the expert witnesses ... you must resolve that conflict and determine which of the opinions to accept as true and accurate."

### III.

■ We turn to Regional's claim of reversible error resulting from two jury instructions involving procuring cause. Whether Hoke was a procuring cause of the sale was a question of fact for the jury. *Moran v. Audette,* 217 A.2d 653, 655 (D.C. 1966). The court instructed:

> If you find that the plaintiff was the procuring cause of Mr. Jawer's participation in the sale, then you may find that the plaintiff was the procuring cause of the sale of the property to the partnership, so long as all the elements of the definition of procuring cause as I have previously instructed you are satisfied.

Regional claims essentially that this instruction erroneously allowed, even required, the jury to find for Hoke without explicitly finding that he was the procuring cause of the sale to the partnership. However, the judge expressly added the last clause of the instruction to avoid this result. This instruction was preceded at trial with the clear instruction that Hoke must prove by a preponderance of the evidence that he was the procuring cause of the sale to the purchaser, specifically that he was "that cause which originates a series of events which without a break in their continuity results in the accomplishment of a sale to a purchaser ready, willing, and able to buy upon terms authorized to the broker by the seller." *See National Savings & Trust Co. v. Kahn,* 112 U.S.App.D.C. 155, 300 F.2d 910 (1962); D. BURKE, LAW OF

REAL ESTATE BROKERS § 3.4 (1982 and 1987 Supp.). Though the challenged instruction was adapted from a case with somewhat different facts from those involved here, *see Hilbert v. Shilby,* 55 A.2d 856 (D.C. 1947), we hold that in combination with the other procuring cause instructions it was correctly given in the circumstances of this case. "[I]t is the general rule in this country that a broker's right to a commission is not affected by the fact that the customer procured by him became associated with others who joined with such customer in the purchase of property." *Zetlin v. Scher,* 241 Md. 590, 217 A.2d 266, 269 (1966) (citing, *inter alia,* 12 AM.JUR.2D *Brokers* § 191 (1964); 164 A.L.R. 949–52 (1946)).[4]

■ The judge also instructed:

> As you consider the question of whether or not the plaintiff's actions in this case constituted the procuring cause of the sale, you should keep in mind that while the broker may not abandon negotiations and still claim a commission, neither may the owner/seller take over negotiations with the person procured by the broker and thereby defeat a broker's right to a commission.

Regional claims this instruction erroneously implied that Regional bore the burden of proving that its negotiations with the purchaser were proper, and that, in combination with the other instruction, it implied that Brown and Jawer had a duty to inform Hoke of their meetings. We do not see how the instructions created these implications. The instruction is a correct statement of the law, *see Moran v. Audette, supra.* And we agree with the trial court that there was evidence to support giving it; a jury could reasonably find that Brown took over from Hoke negotiations with Jawer.

### IV.

■ Regional also asserts that in any event, Hoke failed to present a prima facie

---

4. Cases cited for the opposite result generally involve more extended time periods or clearer termination of broker negotiations than in the case before us; *e.g., Marshall v. White,* 245 F.Supp. 514, 516–17 (W.D.N.C.1965); *English v. William George Realty Co.,* 55 Tex.Civ.App. 137, 117 S.W. 996 (1909).

case sufficient to go to the jury. In reviewing a motion for a judgment notwithstanding the verdict, we must of course view the evidence in the light most favorable to Hoke. *Oxendine v. Merrell Dow Pharmaceuticals, Inc.*, 506 A.2d 1100, 1103 (D.C.1986). Doing so, we uphold the trial court's determination that the evidence was sufficient to support a jury finding that Hoke was entitled to a commission under the legal principles contained in the trial court's instructions. *See National Savings & Trust Co. v. Kahn, supra.*[5]

AFFIRMED.

---

**5.** With respect to Regional's remaining arguments, 1) the admission into evidence of the brokerage contract involving the Tower Building in Baltimore was within the trial court's discretion concerning questions of relevancy, *e.g., Jones v. Prudential Insurance Co.*, 388 A.2d 476, 481–82 (D.C.1978); 2) the terms of the listing agreement were sufficiently proven, even assuming they were oral, a fact that did not at that time preclude recovery of a commission, *Apostolides v. Colecchia*, 221 A.2d 437, 438 (D.C. 1966); *cf.* D.C.Code § 45–1945 (1986 repl.); and 3) the trial court did not abuse its "large discretion" in determining taxable costs, *Robinson v. Howard University*, 455 A.2d 1363, 1368–69 & n. 10 (D.C.1983). Likewise with respect to Hoke's cross-appeal for prejudgment interest, we agree with the trial court's determination that "the testimony at trial on the varying broker's fees available in 1981 and 1982 precludes the conclusion that the broker's fees determined by the jury herein was a "liquidated debt" as contemplated by D.C.Code § 15–108 (1981)." *See Hartford Accident & Indemnity Co. v. District of Columbia*, 441 A.2d 969, 974 (D.C.1982) ("A debt is liquidated if 'at the time it arose, it was an easily ascertainable sum certain.'") (citation omitted). Whether any fraction of the $60,000 award, representing an admitted minimum percentage commission customarily paid, might be considered "liquidated" is an issue not argued on appeal and which we therefore do not reach.